2019 IL App (3d) 170123
Opinion filed July 26, 2019

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2019

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| | ) | Appeal No. 3-17-0123 |
| v. | ) | Circuit No. 14-CF-2504 |
| | ) | |
| SANDRA P. MAGANA-ORTIZ, | ) ) | Honorable Carla Alessio-Policandriotes, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE McDADE delivered the judgment of the court, with opinion.
Justices O'Brien and Wright concurred in the judgment and opinion.

_____

**OPINION**

¶ 1        Defendant, Sandra P. Magana-Ortiz, appeals from her convictions for aggravated battery and child abduction. In this appeal she argues (1) the State failed to prove her guilty of child abduction beyond a reasonable doubt, (2) the State failed to prove her guilt of aggravated battery beyond a reasonable doubt, and (3) one of her aggravated battery convictions must be vacated because the convictions both derive from a single physical act. We affirm in part, reverse in part, and vacate in part.

¶ 2                                    I. BACKGROUND

¶ 3        The State charged defendant by indictment with two counts of aggravated battery (720

ILCS 5/12-3.05(c), (d)(2) (West 2014)) and one count of child abduction (*id.* § 10-5(b)(1)).

Count I of the indictment charged defendant with aggravated battery and stated that defendant

> "without legal justification, knowingly made physical contact of an insulting or
>
> provoking nature with Mariela Melendez, while Mariela Melendez was on or
>
> about a public way, public property or public place of accommodation or
>
> amusement, namely: the roadway at 320 Wheeler, Joliet, *** *in that said*
>
> *defendant dragged Mariela Melendez from a motor vehicle*." (Emphasis added.)

Count II also charged defendant with aggravated battery and stated that defendant

> "without legal justification, knowingly made physical contact of an insulting or
>
> provoking nature with Mariela Melendez, *in that said defendant dragged Mariela*
>
> *Melendez from a motor vehicle, knowing* Mariela Melendez to be pregnant."
>
> (Emphasis added.)

Count III charged defendant with child abduction and stated that defendant

> "intentionally violated the terms of a valid court order, dated September 17, 2014,
>
> issued by the Circuit Court of Will County, granting sole custody of L.M., a child,
>
> to Juan Melendez, by concealing L.M. in a motor vehicle."

The case proceeded to a bench trial. This recitation of facts is drawn from the trial testimony.

¶ 4        Mariela Melendez testified that she and Juan Melendez had been married since June 23,

2013. In December 2014, Mariela, Juan, and their four children lived at 320 Wheeler Avenue in

Joliet. Mariela explained that she was the biological mother of three of the children and

defendant's son, L.M., also resided in the home. L.M. had lived with Mariela and Juan since he

was four or five months old. He was two years old on the date of this incident. In 2014, Juan initiated legal proceedings to obtain sole custody of L.M.

¶ 5 Around 11 a.m. on December 23, 2014, defendant knocked on the door of 320 Wheeler Avenue. Mariela's daughter, K.G., answered the door. Defendant asked to speak with Juan and explained that she was L.M.'s mother. At that time, Mariela approached the door and was surprised that defendant had found her house because Juan had not given defendant the address. Mariela shut the door and made a telephone call to Juan, who told her to let defendant into the house for five minutes. Mariela let defendant in, and defendant picked L.M. up. Mariela went to the kitchen to attend to her youngest child. While Mariela was away, defendant carried L.M. out the door and ran toward a silver Jeep. K.G. and Mariela, who was seven months pregnant, ran after defendant. Mariela saw defendant put L.M. into the front passenger seat of the Jeep. She leaned into the open driver's side door and tried to remove the key from the ignition. While Mariela was still leaning into the car, defendant put the Jeep in drive and pulled away. Mariela held on to the Jeep as defendant drove for one or two minutes. At that point, Mariela let go of the Jeep. Mariela went to the emergency room, where she received treatment for an injury to her knee and bruising. Mariela's baby was subsequently born healthy.

¶ 6 On cross-examination, Mariela testified that defendant had run over her leg but the medical personnel had not diagnosed her with any bone fractures. Mariela also denied telling a police officer at the hospital that defendant had not run her over.

¶ 7 Ten-year-old K.G. testified that she was Mariela's daughter. On the morning of December 23, 2014, K.G. heard a knock on the door, opened it, and saw defendant. Defendant asked to speak with K.G.'s stepfather, Juan. Mariela asked defendant "[w]ho are you?" When defendant responded that she was L.M.'s mother, Mariela closed the door, but she eventually let

defendant into the house. Defendant hugged L.M., and when Mariela left the room, defendant ran out of the house with L.M. K.G. screamed that defendant was taking L.M. and ran after defendant. When K.G. tried to block defendant from getting into her Jeep, defendant pushed her out of the way and put L.M. in the front passenger seat. When Mariela caught up to K.G., she tried to take the keys out of the Jeep. A woman seated in the backseat grabbed the steering wheel, and the Jeep started moving. According to K.G., Mariela's hand slipped off the side of the Jeep, and the Jeep drove over Mariela's stomach and knee.

¶ 8       Officer Terry Higgins testified that he responded to a child abduction dispatch. He saw the silver Jeep described in the dispatch stop near 602 Summit Street. There, defendant got out of the driver's seat of the Jeep and walked toward Higgins's police vehicle. Defendant told Higgins that she had picked up her child in Joliet. Higgins saw another adult and several children in the Jeep. Higgins identified the other adult as Margarita Saavedra.

¶ 9       Officer Eric Moyes testified that he also responded to the child abduction dispatch. Moyes drove to 602 Summit Street, where he saw defendant speaking with Higgins. Moyes also saw three children and an adult sitting in a Jeep. Moyes identified the adult as Saavedra and noted that she was sitting in the backseat.

¶ 10      Officer Fernando Urquidi testified that he interviewed defendant at the Joliet Police Department. Defendant made an unrecorded oral statement and a written statement. Defendant told Urquidi that she knocked on the door of the Summit Street address where her ex-boyfriend, Juan, had previously lived. Saavedra answered the door, and defendant convinced Saavedra to tell her where Juan currently lived. Saavedra got into defendant's Jeep and directed her to Wheeler Street. There, Mariela told defendant that she would have to call Juan. Juan told Mariela to let defendant visit with L.M. Defendant then told Mariela that she was taking L.M. Mariela

told defendant that she could not take L.M. because Mariela and Juan had custody of L.M. Defendant responded "That is okay. I'm taking my son." Urquidi clarified that defendant told him that Mariela had said that she "had full custody of the child." Mariela told defendant that she was going to call the police. Defendant got nervous, grabbed L.M. and ran out of the house. Defendant put L.M. in the Jeep as she was being chased by Mariela. Mariela reached into the Jeep to remove the key from the ignition. Defendant put the Jeep in drive and accelerated. Defendant saw Mariela fall as she drove away.

¶ 11     In the written statement, defendant said that she went to the Summit Street address, where her former brother-in-law's wife (Saavedra) lived, to look for L.M. Saavedra showed defendant where Juan lived. Juan indicated that defendant could take L.M., but Mariela said no. Mariela said that she was going to call the police, and defendant grabbed L.M. and left.

¶ 12     Urquidi also interviewed Saavedra. Saavedra said that Mariela had chased defendant to the Jeep, reached inside, and tried to remove the key from the ignition. Defendant became nervous and placed the Jeep in drive and depressed the accelerator.

¶ 13     The court took judicial notice of the custody case that granted sole custody of L.M. to Juan. The case file included no indication that defendant received service of the September 17, 2014, custody order. Juan was the only party shown in the court order to have been present when it was entered.

¶ 14     The State also introduced, and the court admitted, into evidence five photographs of Mariela's injuries. The first photograph showed an abrasion to Mariela's left underarm and some skin discoloration around her abdomen. The second photograph showed abrasions and bruising to Mariela's right foot. The third photograph showed an abrasion to one of Mariela's toes on her

left foot. The fourth photograph showed a large abrasion to Mariela's left knee. The fifth photograph showed a large bruise to the inside of Mariela's left leg.

¶ 15 The defense called 13-year-old M.M. to testify. M.M. said that he was Saavedra's son. On December 23, 2014, defendant came to the Summit Street house looking for Juan. Saavedra told defendant that Juan had moved. Neither M.M. nor Saavedra knew Juan's new address, but they were able to show defendant where Juan lived. Saavedra and M.M. rode with defendant to Juan's house. There, M.M.'s aunt, Mariela, answered the door. A few minutes later, defendant ran out of the house with L.M. Mariela followed defendant and struggled with defendant for control of the key to the Jeep. Mariela made contact with defendant's throat while trying to remove the key. M.M. saw Mariela lying on the ground after defendant drove away.

¶ 16 Defendant testified that she had six children and was pregnant with her seventh child. Five of defendant's children lived with her, and L.M. lived with Juan. Juan had been L.M.'s primary caretaker since before September 2014. Defendant knew that Juan had filed a "paternity action," but she did not attend the September 17, 2014, custody hearing. Defendant learned of the custody order after she was charged in the instant case and her criminal defense attorney showed it to her.

¶ 17 On December 23, 2014, defendant did not know that the court had awarded sole custody of L.M. to Juan, and she went to locate her son. Defendant had lost contact with Juan and did not know where L.M. was, but she knew that Juan had last resided at 602 Summit Street. When she went there, Saavedra and her two children entered defendant's Jeep, and one of Saavedra's sons gave defendant directions to Juan's house. At Juan's new house, defendant saw L.M. for the first time since September 2014. Defendant became emotional and ran out of the house with L.M.

Defendant only intended to visit with L.M. and not take him. Mariela never mentioned that she and Juan had full custody or that she would call the police.

¶ 18 When defendant took L.M. to her Jeep, Mariela leaned inside the Jeep and tried to remove the key with one hand while she grabbed defendant's hair with the other. Defendant feared for her safety, started the Jeep, and depressed the accelerator. As the Jeep accelerated, Mariela released defendant's hair. Defendant did not intend to harm Mariela but rather to protect herself when she put the car in motion.

¶ 19 On cross-examination, defendant denied telling Urquidi that Mariela had full custody or that Mariela said defendant was there to take L.M. Defendant also denied pushing K.G.

¶ 20 The parties stipulated that Officer Thomas Schorie would testify that he interviewed Mariela at the hospital. Mariela told Schorie that defendant put the Jeep into drive and she fell as the Jeep moved forward. Mariela did not indicate that she was run over by the Jeep.

¶ 21 During closing arguments, the court asked the parties whether the State had to prove that defendant had actual knowledge of the custody order. The State argued that knowledge could be inferred from the circumstantial evidence, and defense counsel argued the State needed to prove that defendant had actual notice of the order to sustain the child abduction charge. The court found defendant guilty of all three counts. The court imposed sentences of 24 months' probation on each charge, to run concurrently. The court also ordered defendant to have no contact with Juan, Mariela, or L.M. unless a family court found that defendant was fit for visitation. Defendant appeals.

¶ 22 II. ANALYSIS

¶ 23 A. Child Abduction

¶ 24        Defendant argues the State failed to prove her guilt of child abduction beyond a reasonable doubt because the evidence showed that she did not have knowledge of the custody order that she was charged with intentionally violating. The State argues that it proved defendant's knowledge of the order by inference from circumstances of the abduction. We find that the evidence was insufficient to prove that defendant intentionally violated the terms of the custody order because she did not have actual notice of it.

¶ 25        In a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). While the *Collins* standard affords the fact-finder's decision great deference, that decision is not conclusive. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004).

¶ 26        Implicit within defendant's challenge to the sufficiency of the evidence is the legal question of whether her knowledge of the order is necessary to be found guilty of child abduction. Therefore, we conduct *de novo* review of this subissue and then consider whether the evidence was sufficient for the fact-finder to determine that defendant had intentionally violated the custody order. See, *e.g.*, *People v. Ward*, 215 Ill. 2d 317, 324 (2005) (conducting a statutory interpretation analysis where defendant's challenge to the sufficiency of the evidence devolved into an issue of statutory interpretation).

¶ 27        The State charged defendant with a violation of section 10-5(b)(1) of the Criminal Code of 2012 (720 ILCS 5/10-5(b)(1) (West 2014)). This subsection provides:

> "A person commits the offense of child abduction when he or she does any one of the following:

(1) Intentionally violates any terms of a valid court order granting sole or joint custody, care, or possession to another by concealing or detaining the child or removing the child from the jurisdiction of the court." *Id.*

¶ 28      We begin with what we find to be a self-evident principle: no person can intentionally violate one or more *terms* of a valid court order when he or sh*e has no* knowledge that such order has actually been entered by the court and what its terms are. We hold, as a matter of law, that the plain language of the statute requires that, for a person to be guilty of this felony offense of child abduction, he or she must know that a valid order has been entered by the court, what that order holds, and what the terms are for compliance with the order. See *id.*

¶ 29      The evidence in the present case failed to establish that defendant intentionally violated any terms of a valid court order because it clearly showed that defendant was not served with notice of the custody order, did not have knowledge that any such order had validly issued, and, if one had, did not know what any of its terms were. Specifically, the custody case file indicated that defendant was not served with notice of the September 17, 2014, order. Additionally, the order itself states that defendant was not present for the hearing that preceded its entry. Consistent with the order, defendant testified that while she knew that Juan had initiated a "paternity action," she did not attend the September 17, 2014, hearing and was unaware of the order at the time of the incident. Further, Urquidi's testimony that defendant said Mariela had told her that Mariela and Juan had "full custody" of L.M. is uncorroborated. Neither Mariela nor K.G. nor defendant testified that Mariela told defendant that she and Juan had full custody of L.M., and defendant also specifically denied making this statement to Urquidi. Even if Mariela had made this essentially undocumented statement, there was no reason for defendant to believe a representation from a woman she did not even know. More importantly, such a statement is

not, as we have previously shown, a legally cognizable substitute for actual knowledge of the terms of the written and signed custody order. As a lay person with an adverse interest, Mariela would not be trusted to convey the weight and details of the court's order, and defendant would reasonably view Mariela's self-serving statement, if such statement had in fact been made, with suspicion. Overall, Mariela's alleged statement would have been wholly insufficient to provide defendant with the notice required to find defendant "[i]ntentionally violate[ ] any terms of a valid court order." *Id.*

¶ 30 Given the lack of evidence that defendant actually had knowledge of the custody order, the State did not satisfy its burden of showing that defendant intentionally violated it. Accordingly, we find that the State failed to prove defendant guilty of child abduction beyond a reasonable doubt, and we reverse this conviction.

¶ 31 B. Aggravated Battery

¶ 32 Defendant argues the State failed to prove her guilt of aggravated battery beyond a reasonable doubt where the State did not prove that defendant made physical contact with Mariela. We find that the evidence was sufficient to prove defendant guilty of aggravated battery beyond a reasonable doubt.

¶ 33 As with the first issue, we review defendant's challenge to the sufficiency of the evidence under the *Collins* standard. *Supra* ¶ 25. Defendant argues that because it did not prove that defendant made physical contact with Mariela, the State failed to prove her guilt of either of the two aggravated battery charges beyond a reasonable doubt. As charged in this case, both aggravated battery charges required the State to prove that defendant made "physical contact of an insulting or provoking nature with" Mariela. See 720 ILCS 5/12-3, 12-3.05 (West 2014).

¶ 34    The evidence in the instant case established that defendant's Jeep made physical contact with Mariela when defendant put the Jeep in drive and drove away while Mariela clung to the side of the Jeep. The movement of defendant's Jeep caused Mariela to fall. Mariela testified that the Jeep ran over her leg as defendant drove away. The State's photographic exhibits showed bruises and abrasions to her leg that a fact-finder could have found consistent with Mariela's testimony. These photographs were consistent with the fall and vehicle strike that Mariela and K.G. described. Moreover, Mariela's location as she leaned into the area between the open driver's side door and interior of the Jeep could have made defendant aware that any movement of the Jeep could cause Mariela to fall, and a fall could have resulted in Mariela being struck by the Jeep. Therefore, this evidence was sufficient to establish that defendant made physical contact with Mariela, via the vehicle strike.

¶ 35    In *People v. Cameron*, 189 Ill. App. 3d 998 (1989), the Fourth District was faced with a similar challenge to the sufficiency of the evidence of aggravated battery. A state trooper stopped Cameron's truck and initiated a vehicle search. *Id.* at 1001. Before commencing the search, the trooper allowed Cameron to reenter the truck to shut off the engine. *Id.* Instead of turning the engine off, Cameron drove from the scene. In his flight, the door of the truck struck the trooper, causing him to fall and suffer injuries that required medical treatment. *Id.* From this evidence, a jury found defendant guilty of aggravated battery. *Id.* On appeal, Cameron argued the evidence was insufficient to prove his guilt of aggravated battery beyond a reasonable doubt. *Id.* at 1006. The Fourth District found that the evidence was sufficient and explained:

> "The evidence the passenger side door was open and that [the trooper] was standing next to the truck in the open doorway when defendant suddenly started the truck and sped away is crucial to our decision that the evidence supported the

verdict finding defendant guilty of aggravated battery. When this evidence is considered along with the other surrounding circumstances the jury could have found to exist, we conclude a reasonable jury could find beyond a reasonable doubt that defendant was (1) 'consciously aware' the passenger side door was open [citation]; and (2) 'consciously aware' [the trooper] was 'practically certain' to be hit by some portion of the vehicle when defendant drove off [citation]." *Id.* at 1008.

¶ 36    While *Cameron* does not directly address the physical contact element of aggravated battery, it implicitly finds this element to be sufficiently proven by the evidence that Cameron drove off while the trooper stood near the open door of the truck and Cameron's act caused the trooper to suffer injuries. The same kind of facts played out in this case when defendant drove away while Mariela clung to the doorframe of the Jeep before she lost her grip, fell to the ground, and was run over by the Jeep. Therefore, like *Cameron*, the evidence was sufficient to permit a finding that defendant made physical contact with Mariela, via the vehicle strike, and the State proved defendant's guilt of aggravated battery beyond a reasonable doubt.

¶ 37                          C. One Act, One Crime

¶ 38    Defendant argues, alternatively, that one of her aggravated battery convictions must be vacated because the two offenses were based on the single physical act of making contact of a provoking nature with Mariela. The State concedes that defendant's aggravated battery convictions are based on the same physical act. Upon review of the record, we accept the State's concession that defendant's two aggravated battery convictions violate the one-act, one-crime rule. Both of defendant's aggravated battery convictions derive from the same physical act— making physical contact of an insulting or provoking nature by dragging Mariela from a motor

- 12 -

vehicle. See *People v. King*, 66 Ill. 2d 551, 566 (1977) (multiple convictions cannot arise from a single physical act). Accordingly, we vacate defendant's aggravated battery conviction entered under count I of the indictment.

¶ 39                                    III. CONCLUSION

¶ 40        The judgment of the circuit court of Will County is affirmed in part, reversed in part, and vacated in part.

¶ 41        Affirmed in part, reversed in part, and vacated in part.

**No. 3-17-0123**

| | |
|---|---|
| **Cite as:** | *People v. Magana-Ortiz*, 2019 IL App (3d) 170123 |
| **Decision Under Review:** | Appeal from the Circuit Court of Will County, No. 14-CF-2504; the Hon. Carla Alessio-Policandriotes, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Peter A. Carusona, and Kelly M. Taylor, of State Appellate Defender's Office, of Ottawa, for appellant. |
| **Attorneys for Appellee:** | James W. Glasgow, State's Attorney, of Joliet (Patrick Delfino, Thomas D. Arado, and Richard T. Leonard, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |